Stewart v. Jordan.

JOHN STEWART, appellant,

*v.*

ELLA JORDAN et al., respondents,

The proofs disclose that J. S. and his brothers and sisters were the next of kin and heirs-at-law of a bachelor uncle and the natural objects of his bounty; that the uncle was possessed of strong mind and independent will, but entertained strong prejudices against the Roman Catholic religion which his nieces, the sisters of J. S., appeared to favor, one of them having married, and the other having been engaged to marry, a Roman Catholic; that he had declared that no part of his estate should go to the benefit of that religion; that shortly before he made the will in dispute, J. S. wrote to him false and inflammatory statements touching acts of friendship, by the nieces, to the religion which was so obnoxious to him; that when instructions were given for the preparation of the will and when the will was executed, the testator was apparently self-possessed and dispassionate, and that then he gave evidence of having consid-

·ered the claim of his nieces upon his bounty and of having decided against them.—*Held*, that it has not been made to appear that the will was the product of undue influence.

On appeal from a decree of the Morris county orphans court.

*Mr. Charles L. Corbin, Mr. Newton Kitchell* and *Mr. L. C. Williamson* (of Washington, D. C.), for the appellant.

*Mr. Theodore Little* and *Mr. J. H. Ralston* (of Washington, D. C.), for the respondents.

THE ORDINARY.

The decree in question refuses probate of a paper purporting to be the last will and testament of William Stewart, deceased. It is not controverted that the disputed instrument was executed with due formality at Boonton, in this state, on the 25th of December, 1891, and that the alleged testator died in the same place on the 30th of January, 1892, aged about seventy years.

It is admitted that at the execution of the paper Mr. Stewart possessed full testamentary capacity.

The contest against probate is based wholly upon allegations of undue influence exercised by the appellant, John Stewart.

William Stewart was a native of Scotland. He was by trade a stonecutter, uneducated, of strong, positive character, and a Protestant in religion, with a deep-seated antipathy to the teachings of the Roman Catholic Church. He never married. For sixteen or seventeen years previous to his death he boarded in Boonton, in this state, with a Mrs. Carson and her brother, Alexander Brait, Scotch people, whom he had known from childhood. His estate is estimated to be worth about $16,000. His next of kin, and the natural objects of his bounty, are the issue of his brother who, in March, 1887, died in the city of Washington, where he had resided and pursued his trade of stonecutter for many years. Such issue, when the will was executed, were two sons, by name, John and Henry, two children of a deceased son William, and two daughters, Ella and Mary.

John was married and lived with his wife and children in Washington in his own abode. Henry was also married. Ella, for several years, had been married to one Jordan, with whom she had gone to the Roman Catholic Church. Mary was unmarried, but had been engaged to marry a Roman Catholic who had died about two months before the will in question was made.

The father of these children, at his death, left an estate yielding a small income, which he gave to his wife for her life. The estate consisted in part of the stoneyard and shop where the father's business had been carried on. It appears that the son John, who also was a stonecutter, desired to continue his father's business but was not permitted to do so by his mother, and that subsequently, when the sale of a portion of his father's real estate was desired in order to increase his mother's income, he, as one of the remaindermen, refused to consent to it, and that afterwards, when an attempt to secure the desired sale by application to the courts was made, it was successfully resisted by him.

The friction occasioned by these differences between John and his mother led to an estrangement between him and his mother and sisters to such extent that in the fall of 1890, when William Stewart, the uncle, visited his sister-in-law in Washington for several weeks, John did not meet him.

On the 17th of December, 1891, John's mother was stricken with paralysis, and becoming unconscious, without regaining consciousness, died on the 20th of the same month. On the 17th of December John visited her house, and while there had some difficulty with his sister Ella, who upbraided him for his mother's poverty, which had been so extreme as to cause her to pawn the watch of her deceased husband. On the following day, the 18th of December, John, smarting under his sister's censure, and intent upon forestalling and palliating its influence upon his uncle, wrote a letter to the uncle, using his wife as his amanuensis, of which this is a copy:

- "WASHINGTON D. C., Dec. 18, 1891.

"*Dear Uncle Willie,*

" "I write a few lines to let you know that mother is very sick and likely to die before this reaches you. She had a paraletic stroke on Wed. 16th, and has not been conscious yet. Her life has not been a happy one, she has been harassed and worried to her present condition by the rest of the family who is bossed by Ella.

"I have not been in the house for 2 years until I got the call this week. I have had my troubles too, but have always be able to stand on my own feet and never got a cent of help from any of them. God has been good after all. I am working for the same firm for near two years at $3.60 per day. Mother affairs are very bad, she has gone through over six thousand dollars, that I know well. After the rest help her to get through that I was worried to sign to sell some property, and as I knew so well after that was gone mother would land in a pauper institution I would not sign, so they combined and went to law, but I defeated them and now not satisfied with the decision of the judge, they have taken it to a higher court and that is where it is now. I guess the Heavenly Judge will settle it. What do you think, Ella wanted to bring a priest in and Mary was willing, but I soon let them know no Catholic need apply. The next thing will be, Mary will have the cross around her neck, as she is inclined that way.

"The property has taxes due on it for over a year, and there is an article in pawn which I have all the right to believe is my father's watch, Ella holds the ticket, the proceeding of thing is enough to make father turn over in his grave. All I have said in this will be bourne out by many old friends who know the state of affairs.

"I will telegraph when the worse happens, you can use your own judgment in coming. My family is all well, hope this may find you the same.

"Your nephew,

"JOHN STEWART." ..

. In reply to which letter William Stewart wrote the following :.

"BOONTON, Dec. 19th,

" Well, John, I was pleased to receive your letter, I heard of your mother's sickness, and hope whatever is best for her God in his goodness will give her. I dont say much in her favor as a mother, if she had been a better mother, there would have been a better family, but it's no use talking these things over, now we will soon all be gone. I was pleased to know that your labor is good and you could keep squire with the world and keep out of dept. John, I am a very sick man, I am having the grippe for the third time. Yesterday I thought I would have died ; to-day I feal a little better, the doctor says he thinks I will get better. I think they wont make much by goen to court so much, it's to bad to sink the property in dept. Mrs. Ella Jordan and her prest glass buttons and wooden Gods don't count for much. I thought all the family was rather inclined that way. If you had been a steady man that.

Stewart v. Jordan.

would do good and not give, your hard work to the taverns I would try to make your labor lighter. I hope no Roman Catholic paterpence shall ever come out of my labour. I hope God will spair my life long enough to settel that. When you write let me know the names of your family and how old they. Let me know soming about William to Youngs and Henrys. John, I cannot come on, man I can scarce walk across the floor of my room, man I can write no more at present. If God spairs us I want you to come on here to see me.

"WILLIAM STEWART."

On the 22d of December John wrote again to his uncle, as follows:

"WASHINGTON D. C. Dec. 22, 1891.

*"Dear Uncle Willie,*

"I have just received your kind letter. It finds me pretty sick with a sore throat, caught by coming through the night so much since mother was taken sick. My wife Kate was taken sick on 19th and now I have another pair of shoes to work for. It is a fine girl.

"No there is no good to chide mother now there was many things that made me angry, but it is all over now as each will have to paddle their own canoe. I was right, it was that watch that father prized equaled to his children. It, is in pawn for over 5 weeks. I was told this morning by my lawyer that they were defeated in the case again.

"It looks like God intends that right shall prevail. It seems settled that Mary will go with Ella. It will be very lovely while her money lasts. Mother's coffin had to be made in N. Y. as it was a little over the usual size.

"I am very sorry to know you are so sick, I truly hope it will be all right though I know it is painful suffering.

"My family consists of three children, Katherine Agnes, John, and the new baby Elizabeth.

"Henry little one is a fine fellow.

"John is a stout, hearty lad, but his sister Agnes dont grow so well, she keep thin.

"Mother died at 7.30 Sunday 20, she never come to herself, she tried very hard to say something, but it was too late.

"It looks out there a night like an Irish Wake; all is needed pipes and oddv. Some many Irish acquaintances made. I would like to come on and aver you need me I would come.

"I think this is all, only I wish you were better, we are only tolable. Katy is as well as she can be under the circumstances.

"Very truly,

"Your nephew,

"JOHN STEWART."

This last letter was received at Boonton on the 23d of December, and it appears about that time William Stewart sent for a

scrivener, George Anthony, and gave him instructions for the preparation of the will in dispute.   That will provides that the testator's estate shall be converted into money, and after the payment of debts and funeral expenses that one-half of it shall go to his nephew John Stewart, one-fourth to his nephew Henry Stewart, and the remaining fourth to the children of his deceased nephew William in equal parts.   The nephews, John and Henry, are made executors of the will.   The instrument makes no reference to the nieces, Ella Jordan and Mary Stewart.

Mr. Anthony, the scrivener, says that he called William Stewart's attention to his two nieces while the instructions were being given, and that Mr. Stewart expressed an intention to give John the largest share in his estate, saying that it would enable him, when added to that which he would take from his father's estate, to start in business, and that that which he would give Henry, added to that which Henry would take from his father's estate, would also assist him, and that that which he would give to the children of his nephew William would supplement their respective shares in their grandfather's estate so that united they would each equal a full child's share.   As to Mrs. Jordan, he said that she had a husband who would look out for her, and that she would have her share in her father's estate, and as to his niece Mary Stewart, that she would take her share in her father's estate. He gave no further reason and said nothing about cutting his nieces off because of any preference they might have for the Roman Catholic Church.

On the 9th of January, 1892, after the will was executed, John Stewart visited his uncle at Boonton, remaining with him until the 26th of January, four days before the uncle died. There is no evidence as to what transpired between them at this visit.

The appellant admits that he knew that his uncle was prejudiced against Roman Catholics, and that the information conveyed by his letters would prejudice him against his nieces; but he denies that he wrote the letters with intention to create such a prejudice.

The statement in the letter of December the 18th that Mrs. Jordan wanted to bring a priest to her dying mother and that Mary assented, but that the writer of the letter, John, interfered, is untrue in fact. The sisters sent for a Protestant minister.

The only basis of fact, upon which the statement of that letter can possibly rest, is that while the sisters were talking about the individual they would send for, a man who was present suggested that a priest might be had, in which suggestion Mrs. Jordan acquiesced; but the suggestion was not acted upon, and it does not appear that John was present when it was made or knew anything about it until after a Protestant minister had been brought in.

It was shown that the father's watch was pawned by the mother and not by Mrs. Jordan, and that Mrs. Jordan found the pawn ticket among the mother's effects and indignantly exhibited it to John, saying that she would redeem the watch and, when her father's estate was settled, would demand reimbursement for the money she thus expended.

The proofs further disclose that there was no semblance of an "Irish Wake" at the mother's house after her death, and that whatever liquor was drunk there was had in the lower part of the house by John and his brother and a man who had been a boarder in the house for some years. .

It is further shown that some sixteen or eighteen years before his death William Stewart warned his niece Mary that if she ever married a Roman Catholic he would cut her off from any share in his estate, and, it is testified by a witness, but denied by Mary, that, at Boonton, just before the funeral, Mary declared that her uncle was angry with her and had left her mother's house angry, or, as the witness puts it, "in a rage," because she was engaged to be married to a Roman Catholic, and that, consequently, she did not expect to be given any of his property.

Several witnesses testify that Mrs. Jordan also declared that she did not expect to take any part of her uncle's estate because she had married a Roman Catholic, and one of them says that she added, "but I would not give my Catholic husband for all my uncle's boodle." Mrs. Jordan admits that she did declare that

she did not expect to receive part of her uncle's estate, but says
that the reason she assigned for that belief was that her brother
John, after his return from his visit to his uncle, in January,
1892, told her that he had "fixed it." John denies that he so
told her.

The decided preponderance of proof is that Mrs. Jordan as-
signed as the reason for her uncle's expected action, that she had
married a Roman Catholic.

It appears that the man to whom Mary was engaged died in
October, 1891, but it does not appear that the uncle, William
Stewart, knew that fact.

It is also shown that William Stewart was not known to have
made a will previous to the one in dispute, and that he told the
scrivener that the disputed instrument was the first will he had
ever made. And it also appears that Mrs. Jordan was married
to her husband for more than ten years, and that although her
husband was a Roman Catholic her uncle William had several
times been a guest at her house.

It is clear that the matter contained in John's letters is all
that the charge of undue influence can be based upon. Both
those letters were written shortly before the will was made, and
this fact, with the further circumstance that the letters made
misrepresentations of a nature to stir up and inflame the testa-
tor's prejudices and passions, are urged to justify the inference
that the letters influenced the immediate production of the will;
but it does not appear to me that it can be said, with satisfac-
tion, that they did more than arouse the testator to carry out a
pre-existing determination. He had before declared that, because
of her marriage to a Roman Catholic, his niece Ella should not
share in his estate, and he had exhibited anger with his niece
Mary because she had engaged to marry a man of similar relig-
ious faith. He intended that no part of his estate should assist
the church he so bitterly hated. Why he had failed to make a
will before does not appear. Possibly it was because he waited
to first ascertain if his nephews would follow in the footsteps of
their sisters. The expression in his letter to John, "I thought
all the family was rather inclined that way," gives color to this.

Stewart v. Jordan.

conjecture.  However that may be, it is not to be lost sight of that the testator was a man of sound mind, strong will and free from all personal domination.  John had no control over him, for the testator had no hesitation in reproaching him for his intemperate habits.

The scrivener who drew the will to all appearances dealt with a dispassionate man, who did not broach the subject of his prejudices while giving instructions for the preparation of his will. In those instructions he omitted to mention his nieces, and upon the scrivener calling his attention to that omission he replied, not that they had offended him and that he felt a bitterness towards them, as one who was laboring under strong passion would be apt to do, but that one of the nieces had her husband to care for her, and the other had her share in her father's estate.  Perhaps this excuse was insufficient, yet it exhibited a quiet determination and resolution, which concluded the subject.  He was then evidently the master of his temper and judgment, proceeding with deliberation.

It may be possible that John's misrepresentations turned the scale against Mary, but what warrant have we for so saying.  It is a bare inference, amounting to little more than conjecture.

It is impossible for me to reach any other satisfactory conclusion upon the consideration of these letters, than that they resolved the testator to an immediate execution of previously contemplated action.  Is that undue influence?  Is it a domination of his will and the destruction of his free agency?  I think it is clear that both of these questions should be answered in the negative.  Certainly John's will was not substituted for the testator's.

The cowardly and unnatural conduct of John excites the mind to his unmeasured condemnation, but the indignation it arouses must not be allowed to create so strong a desire to punish him that the testator's lawful right to dispose of his property according to the dictates of his own will is lost sight of.

The burden is upon the contestants to show that the disputed paper was not the testator's voluntary act.  I think that they

have failed to sustain this burden, and hence that the will should be admitted to probate.

The decree of the orphans court will be reversed.